# UNITED STATES DISTRICT COURT

for the

District of New Mexico

**FILED**

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) |
| IPHONE ASSOCIATED WITH PHONE NUMBER 505-373-5156, CURRENTLY LOCATED AT 31 RODEO DRIVE, LAGUNA, NEW MEXICO 87026 | ) ) ) |

Case No.    23-MR-684

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ New Mexico _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1153 and 1112 | Crimes Committed in Indian Country and Manslaughter. |

The application is based on these facts:

See affidavit submitted by Special Agent James Jojola and approved by AUSA Brittany DuChaussee.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

JAMES JOJOLA    Digitally signed by JAMES JOJOLA
Date: 2023.03.29 14:57:59 -06'00'

*Applicant's signature*

James Jojola, BIA Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
__Telephonically Sworn and Electronically Signed__ *(specify reliable electronic means)*.

Date: _____03/29/2023_____

_____
*Judge's signature*

City and state:   Albuquerque, New Mexico

John F. Robbenhaar, U.S. Magistrate Judge
*Printed name and title*

| Print | Save As... | Attach | Reset |
|---|---|---|---|

IN THE UNITED STATES DISTRICT COURT
FOR _____

IN THE MATTER OF THE SEARCH OF
IPHONE ASSOCIATED WITH PHONE
NUMBER 505-373-5156, CURRENTLY
LOCATED AT 31 RODEO DRIVE,
LAGUNA, NEW MEXICO 87026

Case No. ___23-MR-684___

## <u>AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE</u>

I, James Jojola, being first duly sworn, hereby depose and state as follows:

## <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession and the extraction from that property of electronically stored information described in Attachment B.

2.     I am a Special Agent ("SA") with the United States Department of the Interior – Bureau of Indian Affairs ("BIA") – Criminal Investigation Unit ("CIU"). I became a BIA SA in December of 2016 and was assigned to the BIA, CIU Laguna Agency in New Mexico. As part of my duties, I have investigated numerous violations of federal law including, but not limited to homicides, sexual assaults, robberies, child abuse and domestic violence. Vehicular homicides are one of my responsibilities. Prior to becoming a BIA SA, and between 2007 and 2016, I was a Police Officer and Supervisory Police Officer for BIA, Southern Pueblos Agency in Albuquerque, New Mexico. I was also Police Officer with the Sandia Police Department and Isleta Police Department in New Mexico.

3.      I have received training from several state, local, and federal law enforcement agencies throughout the United States. I am a graduate from the Federal Law Enforcement Training Center ("FLETC") in Artesia, New Mexico and in Glynco, Georgia.

4.      I have conducted and/or participated in many complex investigations utilizing a variety of investigative techniques to include, but not limited to physical and electronic surveillance; questioning of witnesses, suspects, and informants; applications for and executions of search, seizure, and arrest warrants; and evidence collection.

5.      The information set forth in this affidavit is known to me as a result of my own investigation or has been communicated to me by other law enforcement officers, agencies or agents.

6.      This affidavit is intended to show there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7.      The property to be searched is an Apple iPhone, unknown serial number, burnt orange in color, and with a cracked back hereinafter the "Device." The Device is currently located at 31 Rodeo Drive, Laguna, New Mexico 87026, the Laguna Tribal Detention Facility, and is listed under property of the defendant, CODY CHARLIE.

8.      The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

9.      On August 7, 2022, at approximately 4:30 AM, Laguna Police Department (LPD) Police Officers were dispatched to Interstate 40 (I-40) at approximately mile post 130 in reference to a vehicle crash. LPD dispatch advised responding officers of a single vehicle which was off the roadway with debris on the roadway.

10.     Upon arrival at the scene, officers observed a section of a vehicle lying in the center median with debris strewn about the median and eastbound roadway shoulder. There was a single vehicle down the embankment on the south side of the interstate, which was later identified as a gold-colored Lexus GX. There was also a second vehicle located in the bushes on the south side of the guardrail just a short distance from the Lexus, which was later identified as a silver colored Ford Explorer.

11.     Upon closer inspection of the scene, officers located a deceased female on the ground with blood exiting from her mouth. The female was approximately 15 feet away from the Lexus, which was almost completely upside down, laying on the right of way barbed wire fence. While inspecting the vehicle, officers also located a deceased male subject, who was face down in the sand with the left rear tire of the Lexus being on top of the upper portion of his body. A third subject, located approximately 60 feet northeast of the Lexus, was a deceased male who was laying between the roadway and right of way fence.

12.     Officers checked the Ford vehicle which was involved but did not locate any persons in or around the vehicle. During this time, as officers were looking for occupants of the Ford Explorer bearing the New Mexico license plate AZCM12, they located documents containing the name "Cody Charlie", who would later be identified as the registered owner of the

Ford vehicle. Cody Charlie will herein be referred to as CHARLIE for the remainder of this affidavit.

13.     On August 7, 2022, at approximately 5:50 AM, BIA SA James Jojola, the Affiant, was notified of the incident and would respond to the scene to being an investigation. Affiant met with LPD SA Brandon Mariano and was briefed on the incident and the information gathered thus far. New Mexico State Police (NMSP) Crash Reconstruction Unit (CRU) were requested to assist in the crash investigation and reconstruction.

14.     LPD Police Officers attempted to locate CHARLIE at his residence and left information with his family to have CHARLIE contact LPD when he returned home.

15.     Upon completion of the scene investigation, Affiant was notified CHARLIE had contacted LPD dispatch and was at his parents' residence located at 19 Turquoise Trail in Laguna. Affiant and SA Mariano responded to the residence and contacted CHARLIE who was outside the residence with a male subject who was later identified to be his brother.

16.     Investigators identified themselves and stated the nature of the contact. CHARLIE was asked about his vehicle being involved in a vehicle crash. He immediately stated he was not driving. He then went on to explain he had been drinking with some friends in Grants, New Mexico and they were driving him to another residence located in Tohajiilee, New Mexico to drink more beer. CHARLIE stated he fell asleep and the next thing he recalled was hearing them saying "run." He woke up and everything was ringing. He was scared and jumped out of the vehicle and started running. He ended up walking back to his parent's home.

17.     Affiant asked CHARLIE if he was willing to move to Affiant's office for a more in-depth interview. CHARLIE agreed to move and was transported to the BIA Laguna Agency located at 13 Rodeo Road.

4

18.     On August 7, 2022, at approximately 12:18 PM, Affiant and SA Mariano conducted an interview with CHARLIE. During the interview CHARLIE stated, the day before he'd left Acoma Pueblo after a fight with his girlfriend and ended up in Grants, New Mexico. While in Grants, CHARLIE stated he met up with a female friend and attended a party at an unknown location. He stated he began to consume alcoholic beverages at the party and became heavily intoxicated. He stated several times that he was highly intoxicated and a one point, CHARLIE stated he was too intoxicated to drive.

19.     CHARLIE stated he left the party with an individual known to him only as "CJ" and CJ's girlfriend whose name he did not know. They were going to CJ's residence located in Tohajiilee to drink more beer. According to CHARLIE, CJ's girlfriend was driving, and CJ was in the front passenger seat. CHARLIE stated he sat in the back seat behind the driver. He also stated he began to fall asleep before they left Grants and was "in and out" while they were driving. CHARLIE recalled they passed the Sky City Casino which is located off I-40. He asked where they were and was told they were almost to the residence in Tohajiilee. The next thing CHARLIE remembered was everything ringing, he was confused and did not know what to do. He stated he could not get in trouble with his vehicle. He described running downhill and away from his vehicle, then running up and down hills along the side of the road. CHARLIE stated it was dark and he used the flashlight on his phone until the battery eventually died.

20.     During the interview with CHARLIE, Affiant observed bruises on his left shoulder and collar bone area, which CHARLIE stated were from his seatbelt. He had abrasions to both of his knees and scrapes to both of his shins. CHARLIE also had an injury to his left forearm which he stated came from his watch. The injuries noted on CHARLIE were documented through photographs.

5

21.      Affiant was able to obtain CHARLIE'S signature on a voluntary consent to search form for the Ford Explorer which CHARLIE owed and which was involved in the crash. CHARLIE also voluntarily provided buccal swab samples when requested for possible DNA testing. Upon completion of the interview, CHARLIE was transported back to his residence.

22.      On August 9, 2022, at approximately 11:05 AM, Affiant met with NMSP, CRU Agents, Sergeant Steven Carroll and Todd Sibley at LPD where the Lexus and Ford vehicles were being stored. Prior arrangements were made to have NMSP, CRU conduct a vehicle search of both vehicles and perform Event Data Recorder (EDR) downloads as part of the of the crash investigation.

23.      During the search and inspection of the Ford Explorer, it was found that the only set of air bags to deploy were the driver side airbags, both the steering wheel air bag and the knee airbag. It was found that the only seatbelt in the Ford Explorer that was locked was the driver's seatbelt, indicating the driver's seat belt was the only seatbelt which was in use during the time of the impact from the crash. It was determined that no other persons were in the Ford Explorer at the time of the crash. Both the airbags were removed for DNA testing.

24.      It was determined the Ford Explorer was travelling at a high rate of speed and well above the posted speed limit of 75 miles per hour (MPH) at the time of the crash. Downloaded data showed the Ford was travelling at 116 MPH at the time of impact. This would put the Ford at 41 MPH above the posted speed of limit.

25.      On November 16, 2022, Affiant was notified of the arrest of CHARLIE by LPD. Affiant would coordinate with SA Mariano to meet and conduct a follow up interview with CHARLIE. CHARLIE was being housed at the Ramah Navajo Detention Center located in Ramah, New Mexico due to the local detention facility being under renovation.

26.     On November 17, 2022, at approximately 10:11 AM, SA Mariano and Affiant arrived at the detention center to meet with CHARLIE inside the Ramah Navajo Detention Center. Detention staff brought CHARLIE to investigators and investigators told CHARLIE the nature of the meeting. CHARLIE was advised of his constitutional rights and stated he was willing to speak with investigators. He also signed a waiver of rights form.

27.     CHARLIE was asked if he needed to elaborate on anything he may have forgotten about the first time he spoke with investigators or change his statement. He repeated the initial story he told during the first interview with investigators. He was then confronted by investigators with information from their investigation including that the female CHARLIE mentioned being with the night of the crash denied she was with him and that the results of the search of the Ford provided evidence that only one person was the Ford and no one else.

28.     CHARLIE eventually told investigators he was sorry he put the blame on someone else. He admitted to being the driver of his Ford Explorer and admitted to investigators he was drinking alcohol prior to the crash. CHARLIE said after the fight with his girlfriend, he drank a couple beers and then went up to the mountains by himself. While there, CHARLIE also drank a shooter of fireball. It is unknown how long he stayed at this location. At some point, he got into the Ford and got onto the highway at mile marker 114. In the car, he tried calling his girlfriend multiple times, but she would not answer. On the interstate, CHARLIE remembers traveling 75 and then sped up to 80 MPH because he was angry his girlfriend was not answering his calls or texts. He remembers looking at his phone and texting but doesn't remember seeing any lights on the road because it was dark. Then he remembers his Ford flashing an "impact" warning before the car pulled off the highway. CHARLIE admitted to fleeing the scene after the

crash and purposefully taking a path to avoid detection because he was afraid of the consequences of having alcohol in his system.

29.    CHARLIE's admissions about his cell phone use before and during the car crash indicate there may be evidence on his cell phone or provided by his cell phone account about CHARLIE's location before the crash, including how long he was at the mountains before getting in his Ford. Information on his cell phone or cell phone account may provide location information for CHARLIE's whereabouts during the crash and after the crash, including his path after he fled the scene. Additionally, his cell phone or cell phone account may also contain evidence about how many times CHARLIE texted his girlfriend, the length of the text messages, the content of the messages, how many times he called his girlfriend, if he left voicemail messages, the length of the voicemail messages, and the content of the voicemail messages. This information would provide evidence regarding CHARLIE's distracted driving and his emotional state, both of which may have contributed to the crash in addition to the alcohol consumption. The time stamps from the text messages and phone calls will also provide a timeline of CHARLIE's night and the crash.

30.    For the purposes of this Affidavit the suspect is CODY CHARLIE ("CHARLIE"), an enrolled member of the Acoma Indian Tribe which is a federally recognized Indian Tribe.

31.    The crash occurred within the exterior boundaries of the Laguna Indian Reservation, State of New Mexico and is considered "Indian Country."

32.    Based on my training and experience and the facts set forth in this Affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1153, crimes committed in Indian Country, along with 18 U.S.C. § 1112 manslaughter have been committed by CHARLIE. There

is probable cause to search the items described in Attachment A for the information described in

Attachment B which is evidence of those crimes further described in Attachment B.

33.     The Device is currently in storage at 31 Rodeo Road, Laguna, New Mexico

87026. The Device was put into storage at the Laguna Detention Facility as CHARLIE'S

property after he was arrested on November 16, 2022. In my training and experience, I know that

the Device has been stored in a manner in which its contents are, to the extent material to this

investigation, in substantially the same state.

## **TECHNICAL TERMS**

34.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

    a.   Wireless telephone: A wireless telephone (or mobile telephone, or cellular

       telephone) is a handheld wireless device used for voice and data communication

       through radio signals. These telephones send signals through networks of

       transmitter/receivers, enabling communication with other wireless telephones or

       traditional "land line" telephones. A wireless telephone usually contains a "call

       log," which records the telephone number, date, and time of calls made to and

       from the phone. In addition to enabling voice communications, wireless

       telephones offer a broad range of capabilities. These capabilities include: storing

       names and phone numbers in electronic "address books;" sending, receiving, and

       storing text messages and e-mail; taking, sending, receiving, and storing still

       photographs and moving video; storing and playing back audio files; storing

       dates, appointments, and other information on personal calendars; and accessing

and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals.  When

10

a GPS antenna receives signals from at least four satellites, a computer connected

to that antenna can mathematically calculate the antenna's latitude, longitude, and

sometimes altitude with a high level of precision.

d.   PDA: A personal digital assistant, or PDA, is a handheld electronic device used

for storing data (such as names, addresses, appointments or notes) and utilizing

computer programs. Some PDAs also function as wireless communication

devices and are used to access the Internet and send and receive e-mail. PDAs

usually include a memory card or other removable storage media for storing data

and a keyboard and/or touch screen for entering data. Removable storage media

include various types of flash memory cards or miniature hard drives. This

removable storage media can store any digital data. Most PDAs run computer

software, giving them many of the same capabilities as personal computers. For

example, PDA users can work with word-processing documents, spreadsheets,

and presentations. PDAs may also include global positioning system ("GPS")

technology for determining the location of the device.

e.   IP Address: An Internet Protocol address (or simply "IP address") is a unique

numeric address used by computers on the Internet. An IP address is a series of

four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).

Every computer attached to the Internet computer must be assigned an IP address

so that Internet traffic sent from and directed to that computer may be directed

properly from its source to its destination. Most Internet service providers control

a range of IP addresses. Some computers have static—that is, long-term—IP

11

addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

   f.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

35.    Based on my training and experience, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, GPS navigation device, PDA, IP Address, and the Internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, when they used this device, and where they used this device, who they contacted with the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

36.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. This information can sometimes be recovered with forensics tools.

37.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how

the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

g.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file.

h.   Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

i.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

j.   The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

k.   Further, in finding evidence of how a device was used, the purpose of its use, who

used it, and when, sometimes it is necessary to establish that a particular thing is

not present on a storage medium.

38.    *Nature of examination.* Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent

with the warrant. The examination may require authorities to employ techniques, including but

not limited to computer-assisted scans of the entire medium, that might expose many parts of the

device to human inspection in order to determine whether it is evidence described by the warrant.

39.    *Manner of execution.* Because this warrant seeks only permission to examine a

device already in law enforcement's possession, the execution of this warrant does not involve

the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the

Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

40.    I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the Device described in Attachment A to seek the items described

in Attachment B.

*This Affidavit has been reviewed by AUSA Brittany DuChaussee.*

Sworn to under penalty of perjury:

JAMES JOJOLA   Digitally signed by JAMES JOJOLA
Date: 2023.03.29 14:58:52 -06'00'

James R. Jojola

14

Special Agent
Bureau of Indian Affairs

Electronically submitted and
telephonically sworn on March 29,
2023:

_____
UNITED STATES MAGISTRATE JUDGE

15

## **ATTACHMENT A**

The property to be searched is an Apple iPhone, unknown serial number, hereinafter the "Device." The Device is currently located at 31 Rodeo Drive, Laguna, New Mexico 87026.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.



**<u>ATTACHMENT B</u>**

1.      All records on the Device described in Attachment A that relate to violations of

18 U.S.C. § 1153, crimes committed in Indian Country, along with 18 U.S.C. § 1112

manslaughter and involve CODY CHARLIE since August 6, 2022 – November 17, 2022,

including:

2.      The following information about the customers or subscribers of the Account:

    i.   All stored and in-coming / out-going voice mail messages, text messages,
multimedia messages, photographic images, and video images/files, to
include the ***<u>contents/details</u>*** of these items;

    ii.  All existing printouts from original storage of all the text messages
describe above, to include electronic copies of text messages (content and
activity) including SMS (short messaging service) and MMS (multimedia
messaging service) messages;

    iii. All text messaging logs, including date and time of messages, and
identification numbers associated with the handsets sending and receiving
the message;

    iv.  All transactional information of the telephones and/or voicemail accounts
described above, including log files, messaging logs, local and long
distance telephone connection records, records of session times and
durations, the temporarily assigned network address (such as Internet
Protocol ("IP") addresses) associated with those sessions, dates and times
of connecting, methods of connecting, telephone numbers associated with
outgoing and incoming calls, cell towers used, and/or locations used and

other subscriber numbers or identities (including the registration IP address);

v. All business records and subscriber information, in any form kept, pertaining to the individual accounts and/or identifiers described above, including subscribers' full names, user names, screen names, residential addresses, mailing addresses, business addresses shipping addresses, and e-mail addresses, date account was opened, length of service, the types of service utilized, ESN (Electronic Serial Number) or other unique identifier for the wireless device associated with the account, Social Security number, date of birth, telephone numbers, other identifiers associated with the account;

vi. Detailed billing records, showing all billable calls including outgoing digits, means/source of payment (including any credit card or bank account number);

vii. All records indicating the services available to subscribers of individual accounts and/or identifiers described above;

viii. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"); and

ix. All records (i.e., notes) pertaining to communications between Verizon and any person regarding the account or identifier, including contacts with support services and records of actions taken; and

b. All records and other information relating to wire and electronic communications sent or received by the Account(s), including:

i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received, as well as per-call measurement data (also known as the "real-time tool" / "round trip tool/time" or "RTT" data)., EVDO historical handset data, and any other historical GPS Precision Location Information and Cell Site Location Information ("CSLI").

c. Any remote cloud storage services including _Verizon_ Cloud or any other cloud backup services and access to the **_contents_** of the Account cloud storage or other content storage and backup services under the providers control, to include metadata.

## **Information to be seized by the government**

All information described above that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 1153 and 1112, involving CODY CHARLIE since **August 6, 2022 –**

**November 17, 2022**, including for the account listed in Attachment A, information pertaining to the following matters:

        a.      Evidence indicating how and when the cellular device and associated cellular service was used to determine the chronological context of cellular device use, account access, and events relating to the crime under investigation;

        b.      Evidence indicating the geographic location of the cellular device at times relevant to the investigation;

        c.      Evidence indicating the cellular device owner or user's state of mind as it relates to the crime under investigation;

        d.      The identity of the person(s) who created the account associated with the cellular device and/or used the cellular device, including records that help reveal the whereabouts of such person(s).